CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

NOV 1 2 2013

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **HARVEY L. MARTIN, JR.,** | ) | |
| | ) | Civil Action No. 7:11-CV-00244 |
| *Plaintiff,* | ) | Civil Action No. 7:11-CV-00467 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **YOKOHAMA TIRE CORPORATION,** | ) | |
| | ) | **By: Hon. James C. Turk** |
| *Defendant.* | ) | **Senior United States District Judge** |
| | ) | |

Plaintiff Harvey L. Martin, Jr. ("Plaintiff" or "Martin"), filed two separate actions against his former employer, Yokohama Tire Corporation ("Yokohama"), and those actions have been consolidated into Civil Action No. 7:11-cv-244. In his two (now consolidated) complaints, Martin raises three district claims. First, he claims he is a non-exempt employee under the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 ("FLSA"), and that Yokohama violated the FLSA when it failed to pay him overtime for hours he regularly worked above forty hours per week. See ECF No. 8.[1] His second and third claims assert violations of the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213. Specifically, he alleges that he suffers from the disability of diabetes and asserts that (1) Yokohama failed to accommodate his disability; and (2) Yokohama constructively discharged him in violation of the ADA. See generally, ECF No. 1; see also ECF No. 34 at 20-41 (Plaintiff's opposition to summary judgment).

Pending before the Court is Yokohama's motion for summary judgment as to all three claims. ECF No. 32. Yokohama first contends that Martin is an exempt employee under the

---

[1] Unless otherwise noted, all docket references ("ECF No. __") are to entries in Civil Action No. 7:11-cv-244. Additionally, in light of the prior consolidation of these cases, Civil Action No. 7:11-cv-467 is hereby administratively closed. From the date of this Opinion and attached Order, all documents in the case shall be filed only in 7:11-cv-244.

FLSA and thus is not entitled to overtime pay. As to his ADA claims, Yokohama denies that it failed to accommodate Martin's disability and further denies that he was constructively discharged in violation of the ADA. Martin filed a response in opposition to the motion, ECF No. 34, and Yokohama filed a reply. ECF No. 35. The Court heard oral argument on September 26, 2013, and the matter is now ripe for disposition.[2] For the following reasons, Defendant's Motion for Summary Judgment, ECF No. 32, is **GRANTED IN PART and DENIED IN PART**. It is **GRANTED** as to all of Martin's claims except his claim that Yokohama failed to accommodate his disability, and is **DENIED** as to that claim.

## I.      Factual Background

Yokohama Tire Corporation is the North American manufacturing and marketing arm of a Japanese corporation and it employs approximately 1000 employees at its tire manufacturing facility in Salem, Virginia. ECF No. 33-6, Holladay Decl. ¶¶ 2-3. The hourly production and maintenance employees at Yokohama are represented by the United Steelworkers, Local Union No. 1023 ("the Union") and a collective bargaining agreement between the Union and Yokohama has existed for the entire time Martin has been employed there. Id. ¶ 3.

Martin was hired by Yokohama in 1999 as a Tire Press Operator and worked in a number of different hourly positions with Yokohama until 2003, most of them in Division 100. ECF No. 33-1, Martin Dep. at 30-32.[3] On August 7, 2003, he was promoted to the position of Personnel Supervisor in Division 100, which was the position he held until the time he resigned on October

---

[2]  The Court has also considered the October 1, 2013 letter from Martin's counsel more fully supplementing his response to a question of the Court at argument, ECF No. 38, and Yokohama's letter in response, ECF No. 40, as well as the amended, corrected exhibits filed by Yokohama on October 2, 2013. ECF No. 39.

[3]  Neither party has provided the entirety of Martin's deposition; instead, excerpts can be found at ECF Nos. 33-1, 33-13, 33-14, and 34-1. These exhibits are collectively referred to herein as "Martin Dep."

19, 2009. Yokohama treated its Personnel Supervisors as salaried employees, and consistent with this, Martin was paid on a salary basis while he held this position.

### A.    Martin's Job Duties

The nature of Martin's position and his duties are relevant to his FLSA claim and so are discussed in the context of analyzing that claim, see infra at Section II.B, but the Court also describes his general duties here. Martin's overall responsibility was to direct the work of all hourly employees in Division 100 on his shift—which would typically be seven to ten employees—and that to be accountable for production and quality in Division 100 on his shift. He explained that his main job was "to keep the machine[s] running and report any problems to upper management." Martin Dep. at 37-41. That is, he was responsible for making sure all the equipment was operating properly, and dealing with any operational problems that arose. For example, he had to ensure the proper inventory levels of materials for the shift, determine how much material he needed and how many batches to run, make sure that the employees in his division were on the equipment they were supposed to be on, and reassign employees to cover for absent employees. He provided reports every two hours to his supervisors regarding production numbers, and at the end of each shift, he provided a final report on production and would attend a production meeting with the other supervisors. Id. at 37-41; 52-56.

Additionally, he was tasked with ensuring that new employees were trained or instructing them on how to operate machines. Id. at 57-58. He also ran monthly safety drills for his employees and discussed safety issues with them. Id. at 51-52.

### B.    Events Martin Alleges Were Discrimination in Violation of His Rights Under the Americans with Disabilities Act

Martin was diagnosed with diabetes in November 2008, and Yokohama does not argue that Martin's diabetes did not constitute a disability under the ADA. See ECF No. 33, at 23-33. It

is likewise undisputed that at least some of Martin's supervisors knew of his diabetes. As noted, he claims that Yokohama discriminated against him because of his disability, making his working environment so hostile that he was constructively discharged. He also claims that Yokohama failed to accommodate his disability. He relies on a number of different incidents in support of his claim, as discussed below.

### 1.   Martin Applies For and Is Not Selected for a Different Supervisory Position

On July 21, 2009, Yokohama posted a vacancy for a Division 400 Technical Supervisor position. ECF No. 33-6, Holladay Decl. ¶ 12. Martin applied for the position, but he did not receive it. Instead, Yokohama selected another Personnel Supervisor who was more familiar with Division 400 and had spent the majority of his career in that Division, and thus was deemed more qualified that Martin. Id.; see also ECF No. 33-10 ¶¶ 2, 4, 6 (declaration of Joseph Gallagher, who made the decision to hire the other individual). Martin contends that Yokohama's failure to promote him to the position constituted a failure to accommodate his disability. Specifically, he claims that the Division 400 position would have allowed him more regular meal times and breaks to eat, which he says would have allowed him to more easily control his diabetes. ECF No. 34 at 26.

Yokohama points to several undisputed facts that undermine Martin's claim that its failure to promote him was somehow a failure to accommodate. First, Martin admitted in his deposition that he was not more qualified than the person that was selected. Martin Dep. at 234-35. Second, it is undisputed that the person who made the promotion decision did not know Martin had diabetes. ECF No. 33-10, Gallagher Decl. ¶ 5. Third, there is no testimony that Martin ever informed anyone during the course of seeking that promotion that he needed the position as an accommodation, or that it would help him to better manage his diabetes. Cf. id.

4

(Martin testifying Martin "never informed me that he was requesting the position in Division 400 as an accommodation" and "never raised any issue related to his health diabetes, or any accommodation he might need, either during the application or interview process"); ECF No. 33-6, Holladay Decl. ¶ 13 (stating that Martin never informed Holladay—Yokohama's Human Resources Manager—that he was requesting the position in Division 400 as an accommodation for his diabetes).

### 2.     Comments Made To Him By Supervisors Regarding His Illness

Martin also claims that his supervisors made derogatory comments to him reflecting animus against him because of his disability. First, in July 2009, Martin was in a production meeting with Richard Switzer, who was the Production Manager, and informed Switzer that he was having difficulty seeing the board and experiencing blurred vision due to his diabetes. Switzer "ridiculed" him in front of the other employees, making comments such as, "You must get glasses if you want to keep your job." Later, Switzer said, "About your production numbers, did you eat your lunch today?" Martin interpreted the latter comment as implying that Martin's production numbers dipped in relation to his diabetic condition. When Martin informed Switzer he had to eat frequently because of his diabetes, Switzer replied, "I don't give a fuck whether you eat or not." Martin Decl. ¶ 9; Martin Dep. at 214.

In addition to these incidents, Martin also points to a comment made by Kirk Wohlford,[4] after Martin had used sick leave in September 2009. According to Martin, Wohlford told Martin that he could not miss any more time from work for any reason and then said, "We all get sick and we come to work. The only excuse for missing work again is if you are in the hospital." Martin Decl. ¶ 17.

---

[4] In 2009, Martin reported to Rick Silva, who reported to Wohlford. ECF No. 34-9, Silva Dep. at 8-9.

In addition to these incidents, Martin also testified that, on September 14, 2009, he went to human resources to request FMLA leave, and spoke with Kathy Gabel, who is a secretary to Holladay in the HR department. According to Martin's deposition testimony, Gabel informed him that salaried personnel were not entitled to FMLA leave. Martin insisted that he needed to see his doctors, and Gabel gave him the forms, but told him that "it would do no good." Martin Dep. at 204-25. Martin avers that he repeated to Silva what had occurred with Gabel. Martin Decl. ¶ 18. Martin has not asserted a claim under the Family and Medical Leave Act, however.

### 3. Martin's Requests for Time Off for Illness and Doctor Appointments in August and September 2009

On August 26, 27, and 28, 2009, Martin could not attend his regularly scheduled shifts because he was ill due to his diabetes. After a doctor's appointment on August 26, 2009, he told his supervisor, Rick Silva, that he would have to be out the remainder of the week. Silva informed him to obtain a doctor's excuse and provide it to Wohlford. On August 27, 2009, Martin received a telephone call from Wohlford inquiring as to when he planned on returning to work. Martin told him he had already reported the information to Silva, but gave Wohlford the same information. Martin told Wohlford that he would bring in the doctor's excuse on Monday of the following week. Martin alleges that Wohlford told him he would have to use his vacation time to cover his absences and that Wohlford spoke to him in a rude manner during the call. Martin Decl. ¶¶ 11-12.

Earlier that same week, Martin had scheduled and worked an extra shift to receive overtime pay. He received his normal salary for the week, but he did not receive pay for every hour worked on his overtime shift. Martin Dep. at 154-56.

From September 7 through September 11, 2009, Martin worked the entire week despite feeling very ill and having difficulty walking straight. Martin Dep. at 209-214; Martin

6

Decl. ¶ 13. Although Martin believed he was too ill to be at work, he avers that Wohlford's prior rudeness toward him made Martin fearful to take time off from work. Martin Decl. ¶ 13. On Thursday, September 10, 2009, Silva told Martin that he should make a doctor's appointment because of his illness and advised him to discuss this with Wohlford. Martin followed this instruction but Wohlford would not allow Martin to leave his shift on September 10, 2009, instead directing Martin to work through the shift despite his illness. Martin Decl. ¶¶ 13-14.

Martin called his physician that day and was informed that he should call the following morning and that the doctor's office would attempt to work him into the schedule for Friday. When Martin informed Wohlford of this, Wohlford told Martin to come to work the next morning, September 11, 2009 and to work until the time of his doctor's appointment. Id. Although Martin arrived at work around 7:00 a.m., and was able to make a doctor's appointment for 10:30 a.m., Silva had other supervisors work overtime to cover Martin's shift, which Martin says showed Silva recognized that Martin truly was sick. While on the way to the doctor's office, Silva then called him and informed him that Wohlford insisted he have a doctor's excuse when he returned to work and that Wohlford was angry with Silva for releasing Martin from work. Martin Dep. at 209-214; Martin Decl. ¶¶ 15. Although Martin obtained a doctor's excuse for Friday, September 11, 2009, he did not ask his doctor to release him from any additional days at that time because he did not regularly work on the weekends. Id. At the time he went to the doctor, his glucose levels were irregular, he was experiencing daily pain and his medications required adjustment. Martin Dep. at 143, 145.

On Saturday, September 12, 2009, Wohlford called Martin early in the morning and directed him to report to work by noon that day. Martin Decl. ¶ 16. Wohlford directed Martin to work a 12-hour shift that day and also told him to return on Sunday, September 13, 2009 to work

from noon until 6:00 p.m. Id. On both of these days, Martin was directed to watch a machine to make sure it ran smoothly—a task that is typically performed by a production employee, not a supervisor. Id. Martin believed that Wohlford assigned him this task to retaliate against Martin for taking time off from work to seek medical attention. Id.; Martin Dep. at 209-214.

On Monday, September 14, 2009, after Martin reported to work, he was directed to attend a meeting with Silva and Wohlford. It was at this meeting that Wohlford purportedly said, "We all get sick and we come to work. The only excuse for missing work again is if you are in the hospital." Martin Decl. ¶ 17. Wohlford also told Martin that he was going to take away Martin's overtime pay for the weekend to make up for time missed on Friday. Wohlford also informed Martin that he had to make his medical appointments in the evening after work and not on company time. When Martin reminded Wohlford that he was diabetic and needed to see his regular doctor during working hours, he was told he'd be required to work on weekends to make up time he missed. Id.

Martin further alleges that he was retaliated against for using leave to attend medical appointments on September 15, 2009 when he was transferred, without discussion, to a less desirable shift. Specifically, Wohlford held a meeting with Silva and Martin and told Martin that he would be moved to the night shift. According to Martin, he informed Silva that working this shift was going to disturb his diabetic condition further because of an inability to balance his sleeping and eating schedule. Martin Declaration; cf. Martin Dep. at 175 (Martin explaining that the change to the night shift had a detrimental effect on his diabetic condition due to his inability to regulate his sleep, diet, and medication). Silva testified that there wasn't really any discussion about the switch in Martin's shift, but that it was done to accommodate Martin's doctor's appointments. ECF No. 34-9, Silva Dep. at 36-37.

### 4.    Martin's Access to Food and Food Breaks While Working

Martin also alleges that Yokohama denied him accommodations by denying him adequate breaks to eat. The undisputed facts show that Martin, as a supervisor, had an office with a desk, computer, file cabinets, fridge, and microwave. During his shifts, he was required to e-mail production data from his office to upper management every two hours and so was in his office at least every two hours and could eat at that time. Additionally, Martin testified that he was a smoker and visited the smokers' break room "a few times" per shift and was free to eat at that time. Martin Dep. at 165-66, 171, 257. The smokers' break room had both vending and drink machines. ECF No. 34-6, Johnson Dep. at 18-19; ECF No. 33-6, Holladay Decl. ¶ 24. Martin claimed that if there was a problem with a machine, he could not leave the production floor, but admitted that he was permitted to eat on the production floor, if need be. Martin Dep. at 167, 170-71.

### C.    Events Immediately Preceding Martin's Resignation

On October 6, 2009, the Union President and Vice President, Steve Jones and Davis Murphy, respectively, met with Production Manager Richard Switzer ("Switzer") and Director of Manufacturing Adam Bruce ("Bruce") and reported that one of Martin's subordinates, Tom Watkins, had complained that Martin sexually harassed him in two separate incidents. According to Watkins, Martin had grabbed Watkins' fat rolls around Watkins' stomach area, and told Watkins "he would like to put some Vaseline in that and fuck it." Later that day, as Watkins was eating peanuts in the Lab, Martin allegedly approached him and said he "likes the way he opens his mouth and has something to put in it." Watkins Dep. at 16-17 and Ex. 3 thereto; Jones Dep. 12-24, 29 and Exs. 6, 43 thereto; Murphy Dep. 14-23 and Exs. 41-42 thereto.

Later on October 6, 2009, Jones, Murphy, Switzer, Bruce, HR Manager Holladay and Technical Supervisor Rick Silva ("Silva") had another meeting that also included Martin and

Watkins. During that meeting, Watkins reiterated his complaints about Martin.[5] In response, Martin denied the allegations and said, "I didn't do anything. I'm not a fucking faggot." ECF No. 33-11, Silva Decl. ¶ 7. Martin conceded, however, that he had approached Watkins at some point in the past and grabbed at his own "loin area" or his "crotch" and asked Watkins "if he wanted some of that." Id.

The minutes from the meeting—as well as testimony from several persons who were present—confirm that Martin became loud and belligerent during the meeting, saying that "This is bull, a bunch of shit." In response, Switzer told Martin, "I will give you three seconds to sit down and shut up." Switzer informed Martin that the meeting would not be conducted this way, and eventually the Union and Watkins were asked to leave the meeting. At that point, Martin continued to be unruly, getting out of his chair and repeatedly exclaiming loudly, "Well God dammit, just fire me! Just fire me!" Martin Dep. at 95-97; Silva Dep. 80-81; Holladay Decl. ¶ 15 and Ex. 4 thereto. Several times, Switzer directed Martin to sit down, but Martin continued to move toward the door, saying, "Just fire me!" Id. Wohlford asked Martin if he was resigning, but Martin kept walking toward the door and repeating, "Fire me!" Wohlford eventually told Martin that if he walked out that door, he would be fired or "we take it as you quit." Martin said he was not quitting and repeated, "Well, just fire me!" Switzer informed Martin he would not tolerate that sort of behavior any longer, asked Silva to walk Martin out of the plant, and placed Martin on suspension. According to Holladay, Martin was suspended "because of his hostile, inappropriate, and insubordinate behavior during the meeting," not because of the alleged harassment. Holladay Decl. ¶ 15.

As part of the suspension, Holladay instructed Personnel Administrator, Jacque Ward

---

[5] Watkins also said during the meeting that he had heard Martin make a comment about a female employee walking by that he would "like to bend her over the table and poke her." ECF No. 33-2, Jones Dep. 25.

("Ward") to withhold Martin's pay until further notice. Holladay Decl. ¶ 17 and Ex. 5 thereto; Ward Decl. ¶ 2 and Ex. 9 thereto). Ward sent an email to Yokohama's payroll department in California directing them to withhold Martin's pay while on suspension. By that time, however, Martin's payroll had already been processed and his salary had been direct-deposited in his account. Id. The payroll department directed the issuing bank to reverse the direct deposit, and instead issued a manual check reflecting Martin's pre-suspension salary. Id. After his return from suspension, Martin complained and was "very upset" about the reversal, which had caused "several checks [to] bounce[]." ECF No. 33-7, Ward Decl. ¶ 3.

While Martin was on unpaid suspension, Holladay investigated Watkins' complaints. At the conclusion of his investigation, Holladay was unable to verify Watkins' claims, because there were no third-party witnesses. On October 16, 2009, Holladay told Watkins—during a meeting at which Jones, Murphy, and Wohlford were also present—that he was being reinstated. Holladay warned Martin that future "unruly" conduct would not be tolerated. Holladay also sent Martin a letter that stated Martin had acknowledged engaging in similar conduct in the past, although "just joking around" and that such conduct is inappropriate and will not be tolerated. The letter also explained that Martin's suspension was the result of him becoming so defensive and unruly that he was "out of control" and warned him to do a "better job of controlling [his] emotions." Martin Dep. at 111-16; Holladay Decl. ¶ 20; Jones Dep. at 29 and Ex. 6 thereto.

When Martin returned from his suspension, he worked on October 16, 17, and 18, 2009. He testified that he worked over the weekend even though he had been sick again, and that he told Silva about his problems on Monday, October 19, 2009. Martin Dep. at 136. Silva "just consoled" him. Id.

Also on October 19, 2009, Martin complained to Ward about the reversal of his direct

deposit. Ward apologized and explained what had happened. Martin wanted to meet with Holladay, but Holladay said he would meet with him after he finished a previously scheduled meeting. Martin Dep. at 130-33; Holladay Dec. ¶ 21. Instead of meeting with Holladay, Martin quit that evening, at approximately 6:00 p.m. He went to the guard station and informed his shift superintendant, Scott Doss, that he was upset his pay had been docked and he was quitting. ECF No. 33-8, Doss Decl. ¶ 2 & Ex. thereto. Bruce, who was also at the guard house, asked Martin "if he was sure this is what he wanted to do." Bruce Decl. ¶ 6; Martin Dep. at 160-61. Martin explained that his paycheck was deposited into his account and then taken out, and he was not happy about it. Martin Dep. at 123, 161; Bruce Decl. ¶ 6.

The people Martin spoke with on the day he quit, including Ward, Doss, and Bruce, have all testified that Martin said nothing about his diabetes, his health, or Yokohama's alleged unwillingness to accommodate his disability. Instead, he complained to them about his pay. This is consistent with Martin's admission that he did not complain to anyone on the day he quit about his diabetes or his health. Martin Dep. at 124, 161. Martin testified, however, that he and his wife had discussed his work situation on the weekend of October 17 and 18, and that because of the "ongoing harassment" and "lack of accommodation" for his diabetes, he should resign. Martin Dep. at 122, 135-36, 138.

## II.   ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when a rational trier of fact, considering the evidence in the record as a whole, could find in favor of the non-moving party. Ricci v. DeStefano, 557 U.S. 557, 586

(2009). "Summary judgment is appropriate only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, 'no material facts are disputed and the moving party is entitled to judgment as a matter of law.'" Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (quoting Ausherman v. Bank of Am. Corp., 352 F.3d 896, 899 (4th Cir. 2003)). Put differently, summary judgment should be entered if the Court finds, after a review of the record as a whole, that no reasonable jury could return a verdict for the non-moving party. See Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 958-59 (4th Cir. 1996).

Moreover, a party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citations omitted). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-48. Instead, the non-moving party must produce "significantly probative evidence" from which a reasonable jury could return a verdict in his favor. Abcor Corp. v. AM Int'l, Inc., 916 F.2d 924, 930 (4th Cir. 1990). Thus, "[t]he summary judgment inquiry . . . scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial." Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1316 (4th Cir. 1993). "While courts must take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue, summary judgment disposition remains appropriate if the plaintiff cannot prevail as a matter of law." Evans, 80 F.3d at 958-59.

## B. FLSA Claim

With regard to Martin's FLSA claim, the only issue before the Court is whether there are sufficient facts from which a jury could conclude that Martin was not an "exempt employee." It is undisputed that, in general, Yokohama did not pay Martin overtime for hours he worked above forty hours in any given week and, in particular, did not pay him for time spent prior to and subsequent to his shift in daily meetings. If Martin is an "exempt" employee under the FLSA, then Yokohama was not required to pay him overtime for those additional hours and there is no violation; if he is not exempt, Yokohama's actions violated the FLSA. See 29 U.S.C. § 207(a)(1) (time and a half must be paid for work over forty hours per week); 29 U.S.C. § 213 (a)(1) (persons "employed in a bona fide executive, administrative, or professional capacity" are exempt from the overtime requirement). "[T]he exemptions are to be construed narrowly against the employer seeking to assert them, . . . [and] the employer bears the burden of proving that employees are exempt." IntraComm, Inc. v. Bajaj, 492 F.3d 285, 293 (4th Cir. 2007) (citations and internal quotation marks omitted).

Yokohama contends that Martin falls within the exemption for "executive" employees. Regulations promulgated by the Department of Labor interpreting the FLSA provide that an employee is an exempt executive if the employer can establish that he satisfies each of the following:

> (1) he is compensated at a salary of at least $455.00 per week;
> (2) his primary duty is management of the enterprise or of a customarily recognized department or subdivision thereof;
> (3) he customarily and regularly directs the work of two or more other employees; and

> (4) his suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given a particular weight.

29 C.F.R. § 541.100(a). The parties agree that this is the appropriate test for determining whether Martin is an exempt employee. See ECF No. 33 at 18; ECF No. 34 at 3.

For purposes of the summary judgment motion only, Martin concedes that prongs one and three are satisfied. ECF No. 34 at 4. He argues, however, that there are disputes of fact as to whether Martin meets the second and fourth prongs. The Court disagrees. Instead, Martin's own description of his job duties, see supra at Section I.A., establish that these two prongs are also satisfied.

### 1.    Prong Two—Martin's Primary Duty Was Management of a Recognized Department or Subdivision of Yokohama

Turning first to the second prong, Martin concedes that Division 100 is a recognized department within Yokohama. Martin Dep. at 47, 48. The question then becomes whether Martin's "primary duty" was "management." In making this determination, the Court must consider the character of Martin's job as a whole. 29 C.F.R. § 541.700; see also In re Family Dollar FLSA Litig., 637 F.3d 508, 514 (4th Cir. 2011) (applying the pre-2004 version of the executive exemption).

The term "primary duty" is defined in the regulations as "the principal, main, major or most important duty that the employee performs" and must be based on all the facts in a particular case. 29 C.F.R. § 541.700(a). Factors a court may consider include "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." Id. The amount of time spent performing

15

exempt work can be a useful guide, although it is not dispositive, and is not the sole test. 29

C.F.R. § 541.700(b). But "employees who spend more than 50 percent of their time performing

exempt work will generally satisfy the primary duty requirement." Id.

> The regulations further explain that "management" includes

>> activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102 (emphasis added).

In his opposition, Martin contends that he performed only the underlined functions above,

and asserts that there are at least disputes of fact as to whether he performs the functions that are

not underlined. Based on this, he contends that his "primary duty" was not management.

Martin's argument misses the mark. Even if he performed only some—and not all—of the

functions of "management," it is clear that the vast majority of his time was spent in

management-type functions, and not in non-management. Put differently, although he may not

have performed many of the listed functions of "management," his primary duties all fell within

the scope of those "management functions." Other employees—and especially Union

witnesses—all testified that Martin was a supervisor and a member of management. See, e.g.,

Murphy Dep. 35, Watkins Dep. 9-10; Jones Dep. 39-40. Moreover, the Collective Bargaining

Agreement at Yokohama's Salem location prohibited Martin from performing non-management, production work, a fact Martin acknowledged. Martin Dep. at 104-05. Thus, the Court finds the undisputed facts establish the second prong.

### 2.    Prong Four–Martin's Input into Personnel Decisions Were Given "Particular Weight"

Turning to the fourth prong, Martin posits that he does not satisfy this prong because he did not possess the authority to terminate the employment of any work and that he never handled a grievance filed by an employee in any way. Instead, those decisions and the handling of grievances was done by "upper management." Additionally, although "Mr. Martin informed upper management of personnel problems[,] it was they who made decisions regarding termination or discipline." ECF No. 34 at 6.

Yokohama counters that it is not necessary that Martin had actual authority to hire or fire employees in order to satisfy the fourth prong. It emphasizes that the factor is also satisfied if his input as to personnel decisions is given "particular weight." See ECF No. 33 at 20-22. The regulations provide guidance as to the term "particular weight," explaining:

> To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs. It does not include an occasional suggestion with regard to the change in status of a co-worker. An employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the

employee's change in status.

29 C.F.R. § 541.105. Based on this, courts have found "particular weight" where, for example, an employee's performance review affected other employees' pay, see Gelhaus v. Wal-Mart Stores, Inc., 769 F. Supp. 2d 1071, 1081-82 (E.D. Tex. 2011), and where supervisor depended on the performance reviews performed by an employee, see Monroe Firefighters Ass'n, 600 F. Supp. 2d 790, 801 (W.D. La. 2009).

As Yokohama points out, Martin expressly acknowledged that Wohlford gave Martin's recommendation significant weight in making the decision to terminate Leonard Smith, an employee Martin supervised. See Martin Dep. at 78-80. Additionally, Yokohama points to Martin's admission that, for probationary employees, he prepared weekly performance reviews and made recommendations as to whether the employees should be retained and offered regular employment. Id. at 49-50. Yokohama also points to the testimony of another shift supervisor who has the same duties as Martin, Thomas D. Neel. ECF No. 33-5, Neel Dep. at 23. Neel testified that he (and thus, Martin) either had the authority, or actually did the following: request discipline for employees, walk an employee out of the plant if he violated company rules, make employee work assignments, approve or disapprove vacation requests, monitor employee break times and discipline people for taking too long of a break, address safety issues on his shift in his division, and assign overtime (a task he does "every day"). Neel Dep. at 32-36.

In response, Martin relies solely on his own testimony that he "didn't get [any] say-so in" whether or not probationary employees were retained, that he would give a bad performance review and the employee would get hired anyway, that it "wasn't up to him." Essentially, he testified that he gave input, and that his input was ignored. Martin Dep. at 50. Martin also testified that he never interviewed prospective employees for jobs at Yokohama. Martin

Dep. at 48.

The Court concludes that Martin's testimony, taken as a whole, is insufficient to create a dispute of material fact on this issue. Martin's opinions may not have always been followed by upper management, but the Court concludes–as Martin himself has conceded–that his options were (at least occasionally) given sufficient weight. In short, the Court is firmly convinced that Martin is an exempt "executive" under the FLSA, and that no reasonable factfinder could conclude otherwise.[6]

## C. Americans With Disabilities Act Claims

As noted, Martin asserts two separate claims under the ADA: (1) Yokohama failed to accommodate his disability of diabetes; and (2) he was constructively discharged because of his disability. As to his failure to accommodate claim, the Court concludes there are disputes of fact that preclude summary judgment on this claim in its entirety, although some of the bases for this claim are without foundation. By contrast, Yokohama's summary judgment motion as to his constructive discharge claim is well taken—i.e., there is insufficient evidence from which a jury could find in Martin's favor on that claim.

### 1. Failure to Accommodate

A failure to accommodate claim under the ADA requires a plaintiff to show: "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the

---

[6] Martin also argues that a grant of summary judgment in Yokohama's favor on his FLSA claim would be inconsistent with the result in another case in this district, Asher v. Aphelion Techs. Sys. integrators, Inc., 1999 U.S. Dist. LEXIS 8663 (W.D. Va. 1999). In Asher, Judge Wilson denied the plaintiff's motion for summary judgment, finding that there were disputes of fact as to whether one of the plaintiffs, Russell, was a managerial employee. Judge Wilson specifically noted that "the record [did] not clearly reveal the extent of Russell's management activities." 1999 U.S. Dist. LEXIS 8663, at *7. Here, by contrast, the extent of Martin's management activities has been fully fleshed out and compel a finding that he is exempt.

essential functions of the position . . .; and (4) that the [employer] refused to make such accommodations." Rhoads v. F.D.I.C., 257 F.3d 373, 387 n. 11 (4th Cir. 2001) (quotation omitted); Wilson v. Dollar General Corp., 717 F.3d 337, 345 (4th Cir. 2013). In order to provide notice, Martin was required to inform the employer of both the disability and the employee's need for accommodations, although he need not use the phrase "reasonable accommodation." E.E.O.C. v. Federal Express Corp., 513 F.3d 360, 369 (4th Cir. 2008). When determining whether an employee has requested that his employer make reasonable accommodations under the ADA, the Fourth Circuit has ruled that a "disabled employee possesses a general responsibility to inform his employer that such accommodations are necessary." Id. Additionally, "[i]mplicit in the fourth element is the ADA requirement that the employer and employee engage in an interactive process to identify a reasonable accommodation." Haneke v. Mid-Atlantic Cap. Mgmt., 131 F. App'x 399, 400 (4th Cir. 2005) (citing 29 C.F.R. § 1630.2(o)(3)).

Martin claims that his diabetes constitutes a disability, that Yokohama knew about his disability, and that Yokohama failed to accommodate his diabetes. Martin relies on three instances that he claims each constituted a failure to accommodate. At the hearing, Martin's counsel emphasized that the failure to accommodate claim was based on Yokohama's failure to: (1) allow Martin time off to attend medical appointments and allow him time off when he was ill; (2) allow him to eat regular snacks or meals; and (3) promote him to the Division 400 supervisor position. As described in more detail below, there are disputes of fact that preclude summary judgment on his first requested accommodation. The undisputed facts establish that Yokohama is entitled to summary judgment as to the second and third alleged failures to accommodate. As to the second, there is no evidence Martin was ever not permitted to eat regular snacks and meals. As to the third, this claim fails both because Martin never informed

anyone he was seeking the promotion as an accommodation for his disability, and because he admits he was not the most qualified applicant for the job.

> **a.    Failure to Allow Time Off From Work for Doctor Appointments and Illness[7]**

Applying the elements discussed in <u>Rhoads</u>, <u>supra</u>, there is sufficient evidence from which a jury could find that Martin is a qualified individual with a disability and that Yokohama had notice of Martin's disability here. Indeed, neither of these elements are disputed by Yokohama. The third and fourth elements require Martin to show that "with reasonable accommodation he could perform the essential functions of the position . . .; and (4) that the [employer] refused to make such accommodations." <u>Rhoads</u>, 257 F.3d at 387 n. 11; <u>Halperin v. Abacus Tech. Corp.</u>, 128 F.3d 191, 197 (4th Cir. 1997) (the burden of identifying an accommodation that would allow a qualified individual to perform the job rests with the plaintiff, as does the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable).

Yokohama argues that Martin never requested an accommodation, and thus that it did not refuse to make any accommodation. Put differently, it contends Martin never gave notice of his need for an accommodation. <u>See</u> <u>Federal Express Corp.</u>, 513 F.3d at 369 (employee is required to give "notice of need for an accommodation"). The Court concludes, however, that a reasonable jury could find he has established both that he gave notice of his need for a reasonable accommodation, and that the accommodation was refused.

As to whether he requested an accommodation and identified what the accommodation

---

[7] Analyzing Martin's request for leave as an accommodation is difficult, in part because the parties seem to be attempting to shoehorn the facts of this case into an ADA accommodation framework, when it may fit more neatly into the category of a claim under the Family and Medical Leave Act that he was denied leave. As previously noted, however, Martin has not alleged a claim under the FMLA. <u>See</u> <u>supra</u> at 4-5.

was, Yokohama focuses on Martin's admission that he did not go to Human Resources and expressly request an accommodation from them, as outlined in the employee handbook, see Martin Dep. at 182-84 and Ex. 23 thereto.[8] But Yokohama has also argued that it "accommodated" Martin's need to attend doctor's appointments by unilaterally changing his shift to a weekend shift, which a jury could interpret as Yokohama acknowledging his need for some accommodation.

Significantly, moreover, Yokohama has not disputed that Martin asked to be able to use medical leave on a short-term basis. His request for that leave was denied on September 10, 2009 and the morning of September 11, 2009, when Wohlford told him to report to work despite his being seriously ill. Martin also worked earlier that week and in October, despite being very ill, because he was concerned about Wohlford's negative attitude concerning Martin's use of leave. Likewise, although he was permitted to utilize leave on August 26-28, 2009, he was arguably retaliated against for doing so, by being forced to work on a weekend when he did not normally work, and by being asked to do tasks normally reserved for production employees. Additionally, he alleges that he suffered significant medical problems as a result of working while sick, Martin Decl. ¶¶ 13-15, and based on the unilaterally-imposed shift change to weekend work. Martin Dep. at 175, 212 (Martin explaining that the new shift "messed up [his] regulating [his] medicine," his eating and sleeping habits). Accordingly, the Court concludes there is sufficient evidence from which a jury could find he requested an accommodation and was denied it.

A reasonable jury could also find that Martin's requested accommodation—that he be given a short period of leave, in order to get his diabetes under control and medication better

---

[8]   Yokohama's employee handbook specifies that "Any qualified . . . employee with a disability who requires an accommodation in order to perform the essential functions of the job should contact the human resources department and request an accommodation." Martin Dep. Ex. 23. Martin admits that he never talked to anyone in HR about an accommodation for his disability. Martin Dep. at 183-84.

regulated so that he would be able to return to work and perform the essential functions of his job—was a reasonable one. Both the ADA regulations and the Fourth Circuit have recognized that a short period of leave to obtain treatment may be a reasonable accommodation. See Wilson, 717 F.3d at 344-45 (recognizing that "permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment . . ." may be a reasonable accommodation) (quoting 29 C.F.R. § 1630.2(o)). A leave request is not an unreasonable accommodation "on its face so long as it (1) is for a limited, finite period of time; (2) consists of accrued paid leave or unpaid leave; and (3) is shown to be likely to achieve a level of success that will enable the individual to perform the essential functions of the job in question). Wilson, 717 F.3d at 345 n.7 (citing Halpern v. Wake Forest Univ. Health Sciences, 669 F.3d 454, 465-66 (4th Cir. 2012) and Myers v. Hose, 50 F.3d 278, 283 (4th Cir. 1995)).[9] There are sufficient facts from which a jury could find these three factors satisfied. To summarize, construing the facts in the light most favorable to Martin as the Court must, Wohlford forced Martin to stay at work on September 10, 2009 and to come in on September 11, 2009, even though Martin had communicated that he was very ill, and needed to be off from work. Then, without engaging in the interactive process required once an employee requests a disability,[10] Yokohama simply unilaterally imposed an "accommodation" (a shift change to weekend work) that Martin alleges actually made it more

---

[9]  By contrast, a requested accommodation that an employee be permitted to take extended or indefinite leave, or take leave on an as-needed basis, is generally considered to not be reasonable. See Myers v. Hose, 50 F.3d 278, 282–83 (4th Cir.1995) (reasonable accommodation provisions of the ADA do not require employers to "wait indefinitely," providing extended leave, while an employee's health improves); Rhoads v. F.D.I.C., 956 F. Supp. 1239 (D. Md. 1997), rev'd on other grounds, 257 F.3d 373 (4th Cir. 2001) ("[r]egular attendance is generally, unless otherwise established, regarded as an essential function of such employment;" as a result, "courts have found open-ended work schedules to fail as a reasonable accommodation . . .").

[10]  See 29 C.F.R. § 1630.2(o) ("[t]o determine the appropriate reasonable accommodation [for a given employee,] it may be necessary for the [employer] to initiate an informal, interactive process with the [employee]"). The employer and employee both have an obligation to participate in this interactive process in good faith. See also Kleiber v. Honda of Am. Mfg., Inc., 485 F.3d 862, 871 (6th Cir. 2007).

difficult for him to manage his diabetes, even if it allowed him to go to doctor's appointments during the week.

The Court acknowledges that this case is unusual in that in the typical failure to accommodate case, an accommodation has been denied and the disabled employee is either terminated, quits as a result of not being offered the accommodation, or there is otherwise some adverse action taken against the employee. See Loulseged v. Akzo Nobel Inc., 178 F.3d 731, 734 (5th Cir. 1999) (noting that "generally . . . . claims that an employee has been denied a reasonable accommodation are accompanied by claims that the plaintiff was not hired, nor promoted, or discharged or demoted" but recognizing that it is "arguable that the failure to accommodate an employee standing alone may give rise to a claim under the ADA"); see, e.g., Wilson, 717 F.3d 337 (employee was terminated).

Although the Court concludes that Martin was not constructively discharged, see infra at Section II.C.2, and while it appears highly unlikely to the Court that he quit because of the failure to accommodate,[11] Martin has offered his own sworn testimony that the reason he quit was that he could no longer deal with the lack of accommodation and, in particular, the unwillingness of Wohlford to allow him to take leave when ill. Martin Dep. at 122-23.

In summary, Martin's evidence is sufficient to withstand summary judgment. Thus, the Court DENIES summary judgment on the claim that Yokohama failed to accommodate his disability by denying him his requests for short-term leave.

### b. Failure to Allow Sufficient Breaks for Eating Snacks and Meals

As described supra at Section I.B., the undisputed facts in this case show that Martin was

---

[11] As discussed in more detail in the context of his constructive discharge claim, Martin never raised his diabetes or the alleged failure to accommodate to anyone on the day he quit. He claims, however, that he was feeling particularly badly the weekend before and that he did tell Rick Silva about that on Monday. Martin Dep. at 135-36, 138.

able to take smoking breaks regularly and that there were vending machines in the smokers' break room. Martin was also required to go to his office at least every two hours to provide reports and there were a refrigerator and a microwave in his office. It is also undisputed that Martin was permitted to eat on the production floor. Thus, even assuming that Martin had expressed generally that he needed to be able to eat at regular intervals, those intervals were available to him. The fact that he may have had to perform other tasks while eating does not mean that he was not permitted to eat. In short, to the extent that Martin communicated such breaks were necessary, the Court concludes that Yokohama provided them as a matter of course in his job.

### c. Failure to Promote Him to Division 400 Supervisor Position

Similarly, Martin's contention that he was "denied the accommodation of a transfer to" a supervisory position in Division 400, is meritless. ECF No. 34 at 26. Although Martin alleges that this position would have allowed him to "better manage his diabetic condition," id., noticeably absent from his declaration is any assertion that he told anyone he needed such a position as an accommodation for his medical condition, or that he ever requested it as an accommodation. Moreover, the individual who made the hiring decision testified that he did not even know Martin was diabetic. ECF No. 33-10, Gallagher Decl. ¶¶3-6.

Furthermore, while a transfer to another open position may in some cases be a reasonable accommodation, see 42 U.S.C. § 12111(9) (reasonable accommodation may include "reassignment to a vacant position"), a promotion to a higher-paying job is not a reasonable accommodation if an employee is not qualified for that position. See, e.g., Huber v. Wal-Mart Stores, Inc., 486 F.3d 480, 483-84 (8th Cir. 2007) (the ADA does not require an employer to reassign a qualified disabled employee to a job for which there is a more qualified applicant); see

also Marshall v. AT&T Mobility, 793 F. Supp. 2d 761, 768-69 (D.S.C. 2011) (collecting authority so holding). Martin admitted in his deposition that the individual hired for the Division 400 position was more qualified than Martin was.

### 2. Constructive Discharge

To establish a prima facie case for wrongful discharge under the ADA, Martin must prove "by a preponderance of the evidence that (1) he was in the protected class; (2) he was discharged; (3) at the time of the discharge, he was performing his job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raised a reasonable inference of unlawful discrimination." Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995).

Where, as here, a plaintiff was not terminated, but claims that he was constructively discharged, he faces a high burden. Specifically, he must show that his employer deliberately made his working conditions intolerable in an effort to induct the employee to quit. Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 186-87 (4th Cir. 2004). The working conditions must by objectively intolerable and cannot be based on an employee being "unreasonably sensitive" to his working environment." Id. at 187 n.2 (citing Goldsmith v. Mayor & City Council of Baltimore, 987 F.2d 1064, 1072 (4th Cir. 1993)). Thus, while "[a]n employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers, [h]e is not . . . guaranteed a working environment free of stress." Id. Thus, the Circuit has recognized that conditions must be so intolerable as to compel a reasonable person to resign." Id. at 187 (citations omitted).

Based on the evidence before the Court, it is clear that Martin cannot meet this standard

26

and thus that his constructive discharge claim fails as a matter of law. As discussed in the factual background of this case, Martin points to a number of incidents that he says were an effort to force him to resign. Summarizing, Martin alleges he was forced to resign because (1) on two occasions, his supervisors made insensitive comments that could be construed as reflecting an animus based on his disability; (2) Wohlford required Martin to work when ill or to make up time he missed to attend doctor's appointments; (3) Yokohama changed his shift to weekend work without discussing it with him; and (4) on one weekend, he was forced to do non-supervisory work as retaliation for taking time off.[12]

Even assuming all of these occurred and that they exhibit some sort of discriminatory animus by Switzer and Wohlford, there is still no evidence that purposeful actions were taken by them in an attempt to get him to resign, nor is there sufficient evidence to show that his working environment was so intolerable that an reasonable person would have felt compelled to resign. Two key factors convince the Court that Martin fails to show he was constructively discharged.

First, and most importantly, the incidents that immediately preceded Martin's decision to quit were Martin's outbursts during the meeting regarding Watkins' harassment allegations, Martin's resulting suspension without pay, and the problem with his paycheck deposit being reversed. These were the incidents, and incidents involving his pay and the reversed direct deposit in particular, that Martin complained about on the day he quit. See ECF No. 33-8, Doss Decl. (when Martin conveyed he was quitting, he said he "was upset his pay had been docked" and told Adam Bruce that "his paycheck was deposited into his account and then taken out, and he was not happy about it"); ECF No. 33-9, Bruce Decl. (same); ECF No. 33-5, Neel Dep. at 44

---

[12] The Court does not consider Martin's suspension for his conduct during the Watkins investigative meetings or the reversal of his direct deposit to be factors that could support his constructive discharge claim under the ADA. There is absolutely no evidence before the Court that either of those events had anything to do with his disability or his need for any accommodation.

(recalling that when he spoke with Martin on his last day he was upset about his pay and specifically, "he had overtime on his check and they took the overtime and put them hours towards the time he missed, if I remember right."), ECF No. 33-7, Ward Decl. (stating that on the day he quit, Martin came to Ward's office "and was upset that his direct deposit had been reversed . . . He was very upset about the reversal of the deposit and mentioned that several checks had bounced."). Furthermore, Martin said nothing during the Watkins investigation, or in any of the meetings, about his diabetes or a failure to accommodate his diabetes. Second, as Yokohama notes, if Martin's supervisors had wanted to terminate him, his own outbursts and actions during the October 6, 2009 meeting provided an excellent opportunity to do that. Instead of terminating him, however, his supervisors only suspended him for his conduct during the meeting, and he later received a written warning. Summary judgment is therefore GRANTED against Martin's constructive discharge claim.[13]

## III.  CONCLUSION

For the foregoing reasons, Yokohama's Motion for Summary judgment, ECF No. 32, is **GRANTED IN PART and DENIED IN PART**. It is **GRANTED** as to all of Plaintiff's claims except his claim that Yokohama failed to accommodate his disability when it refused to allow him time off when ill. As to that claim, it is **DENIED**.

ENTER: This _17th_ day of November, 2013.

James C. Turk
Senior United States District Judge

---

[13] Martin's argument that granting Yokohama's summary judgment motion on this claim would "contradict the precedent established in McCall [v. Myrtle Beach Hosp., 1997 U.S. App. LEXIS 23745 (4th Cir. 1997)]" is meritless. While McCall—an unpublished case—and this case contain many factual parallels, the plaintiff in McCall was terminated, as Martin acknowledges. Here, Martin has to satisfy the more difficult burden of proving he was constructively discharged. As discussed herein, even drawing all inferences in the light most favorable to him, he simply cannot establish that he was constructively discharged.